BRYSON, Circuit Judge,
dissenting.
I agree with the majority that it was permissible for the Commerce Department to use Thai data as the basis for selecting a surrogate value for truck freight. As to the use of Philippine import data as the basis for the surrogate value for the carbonized materials used in the production of the subject imports, however, I do not agree.
The majority concludes that the Department’s decision can be upheld in light of the deference due to the agency in its valuation determinations and the plaintiffs’ failure to preserve their claims of error below. I part company with the majority on both points.
1. Waiver
The majority holds that two of the plaintiffs’ arguments have been waived because the plaintiffs failed to present evidence in support of those arguments to Commerce during the administrative review proceeding. The two arguments are (1) that the Philippine import data does not actually contain imports of coconut shell charcoal during the review period, and (2) that the Philippine import data is aberrational compared to data used in previous administrative reviews.
The plaintiffs could no doubt have done a better job of making a record in this case on certain issues, such as whether the price listed in the Philippine publication Cocommunity, on which they rely, was a national price, rather than a regional price, and whether that price excluded duties and taxes. However, their failure to raise objections to the use of Philippine import data during the administrative review process is entirely understandable, because the Commerce Department did not indicate its intention to rely on that data at any point before issuing the final results in this case, at which point it was too late for the plaintiffs to object.
The Court of International Trade made exactly that point when it rejected the government’s waiver • argument below. The court said:
[I]t was not until after the submission of the parties’ case briefs that Commerce made its determination to select the Philippines as the primary surrogate country, and articulated its basis for its selection of sources to value carbonized material and truck freight (i.e., Philippine HTS 4402 and Cost of Doing Busi- ’ ness). It is simply too much to ask of the ' parties to anticipate (1) that Commerce would change the surrogate country between the preliminary and Final Results, (2) the reasons that the Department would state for deciding to change surrogate countries, and (3) precisely how Commerce would value the various *1005 inputs. Under similar circumstances, it has been held that a party “is not required to predict that Commerce would accept other parties’ arguments and change its decision.” Qingdao [v. United States ], 33 CIT [1090] at 1093, 637 F.Supp.2d [1231] at 1237 [ (2009) ]. Accordingly, because plaintiffs had no realistic opportunity to present their arguments before the Department, the court finds that plaintiffs did not fail to exhaust their administrative remedies.
Jacobi Carbons AB v. United States, 992 F.Supp.2d 1360, 1367 (Ct. Int’l Trade 2014). Accordingly, I conclude that the two arguments the majority characterizes as inadequately preserved below have not been waived.
2. Aberrational Data
Notwithstanding its waiver ruling, the majority addresses the merits of the plaintiffs’ contention that the Philippine import data is aberrational.
The government argues that any apparent aberration in the data can be explained by the fact that the first through third' reviews used India as a surrogate country whereas the fourth review used the Philippines. The majority correctly rejects that argument, recognizing that it is “unlikely that the switch from India to the Philippines could account for [the] dramatic change in pricing.” Nonetheless, the majority concludes that it was permissible for Commerce to disregard the discrepancy.
If we compare the surrogate values used in the various administrative reviews (including two more recent administrative reviews), it is clear the Philippine import data used in the administrative review at issue in this case departs wildly from the surrogate value relied on by Commerce in other administrative reviews in this case, so much so that it is highly suspect. Not only is the surrogate value derived from the Philippine import data much greater than the Indian data used in the first through third periods of review, but it is also significantly greater than the data used in the fifth and sixth periods of review, which used data from the Philippines.
The surrogate value of $1203.80 per metric ton is almost three times as high as the highest other surrogate value determined in any of the other periods of review, and it is more than fourteen times as high as the surrogate value for the immediately preceding period of review. Meanwhile, the Cocommunity data on which the plaintiffs rely (indicated by “CoCo” in the table below), showed a price of $265 per metric ton, which was much more in line with the surrogate values found in the prior and subsequent administrative reviews. While there might in some circumstances be an explanation for data that is as grossly anomalous as the Philippine import data, no such explanation appears in the record in this case.
Period of Review Surrogate Value
1st $32.99/MT
2nd $66.256/MT (coconut shell charcoal); $435.62/MT (coal-based carbonized material)
3rd $83.45/MT
4th $1,203.80/MT
CoCo $255/MT
5th $391.67/MT
6th $346.25/MT
*1006 3. Specificity
The plaintiffs argue that the Cocommu-nity data is more specific than the Philippine import data because the Cocommunity data relates to coconut shell charcoal, while the Philippine import data relates to “Wood Charcoal (Including Shell or Nut Charcoal).” The plaintiffs contend that coconut shell charcoal is comparable to the coal-based charcoals used by the Chinese manufacturers, and that wood-based charcoal is not comparable to coconut shell or coal-based charcoal. The majority rejects the plaintiffs’ argument, finding that there is no express determination in the record that coconut shell charcoal is more comparable to coal-based charcoal than to wood charcoal. I believe the majority reads the available evidence too narrowly.
The majority quotes a statement made by Commerce before the trial court in a previous administrative review: “[C]oconut shell charcoal shares similar properties with carbonized material and ... those similar properties are essential in the production of activated carbon. The expert’s report found that coal-based carbonized materials used by Cherishmet and coconut shell charcoal are similar in porosity and adsorption, which are both properties essential in. the production of activated carbon.” Final Results of Redetermination Pursuant to Ct. Remand at 10-11, Calgon Carbon Corp. v. United States, No. 0900524 (Ct. Int’l Trade July 26, 2011), ECF No. 36 (footnotes omitted). While that statement was used to justify the selection of coconut shell charcoal over “other cokes of coal,” the statement is pertinent in this case (where “other cokes of coal” are not involved) because it clearly states that coconut charcoal is comparable to coal-based charcoal. Because the evidence before Commerce established that coconut shell charcoal is comparable to coal-based charcoal, whereas the evidence does not show the same for wood-based charcoal, the Cocommunity data, which was directed to coconut shell charcoal, was more specific than the Philippine import data, which was directed to both wood-based charcoal and charcoal obtained from coconut shell.
4. Defects in the Cocommunity Data
Commerce found that the Cocommunity data was flawed in fundamental ways that rendered it unusable in determining surrogate value. The majority agrees. I do not regard the perceived flaws in the Cocom-munity data as nearly so serious.
To begin with, it is true that the Cocom-munity data is not a perfect match for the value of the carbonized materials used in the production of the plaintiffs’ products. But data used to calculate surrogate value seldom is. By its nature, such data is intended to serve as an approximation — as the “best available information.” 19 U.S.C. § 1677b(c)(l). In this case, however, the evidence fairly shouts that the Philippine import data used by the Commerce Department was not a good surrogate for the value of the carbonized materials used in manufacturing the subject imports. The flaws in the Cocommunity data are trivial in comparison.
The aberrational nature of the surrogate value selected by Commerce should have given Commerce pause and caused it to evaluate the flaws it found in the competing Cocommunity data — that the Cocom-munity price was not shown to be net of duties and taxes, and that the Cocommu-nity price was not shown to be a national price, as opposed to a regional price. Further consideration would have led Commerce to the following conclusions:
First, the Cocommunity price was necessarily exclusive of duties, since the price *1007 was for domestic product, not imported goods.
Second, there was no evidence before Commerce that the Cocommunity price included taxes, and Jacobi represented to Commerce that it did not. But even if, contrary to Jacobi’s representations, the Cocommunity price included taxes, a higher price could only work to the detriment of the plaintiffs because it would increase the dumping margin, not reduce it. It does not make sense to refuse the plaintiffs’ request to use the Cocommunity data on the ground that the data is subject to a flaw that might be prejudicial to them.
Third, the document from which the Co-community data was derived stated: “In the Philippines, the average price of coconut shall charcoal [for April 2010] was $230 [per metric ton].”[1] In the table that listed the prices, however, the reference to the Philippines was accompanied by a reference to “Visayas,” which is a region of the Philippines. While the document suggests that the price was a national price, the reference to “Visayas” provides some support for Commerce’s conclusion that the Cocommunity price is limited to the Visa-yas region of the Philippines. Even accepting that view of the evidence, however, it is highly unlikely that the price in that region is significantly different from the “national” price, since the Visayas region, as the trial court observed, is one of the three principal geographical divisions of the Philippines, occupying the entire central portion of the country.
Finally, it is noteworthy that in the two subsequent administrative reviews (the fifth and sixth), Commerce selected the Cocommunity data over the Philippine im- , port data, finding that the Cocommunity data was both representative (even though it referenced only a single region) and that it was exclusive of duties and taxes.
A fair view of the Cocommunity data thus shows that any flaws with that data are modest. In light of the serious doubts raised by the use of the Philippine import data that includes wood charcoal and that produced a price far in excess of any price used by Commerce in earlier or later reviews of this antidumping duty order, I would hold that it was unreasonable for Commerce to reject the use of the Cocom-munity data in favor of the Philippine import data in calculating the surrogate value for the carbonized materials used in producing the subject imports. Accordingly, I respectfully dissent.